UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA**
ex rel. **JOSEPH FUENTES**, and
**CHRISTOPER RUSSO**

Case No.: 8:09 CV 1245 - T 23
EAJ

       Plaintiff,

v.

**GENZYME CORPORATION,**

       Defendant.

_____ /

**Filed Under Seal Pursuant to**
**31 U.S.C. § 3730(b)(2)**
**Do Not Place In Press Box**
**or Enter on Publicly Accessible System**

## FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

1.  Relators Joseph Fuentes and Christopher Russo ("Relators") bring this action on

behalf of the United States of America against Defendants Genzyme Corporation for treble

damages and civil penalties for its violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.  As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relators have

provided previously to the Attorney General of the United States and to the United States

Attorney for the Middle District of Florida a statement of all material evidence and information

related to the complaint. This disclosure statement is supported by material evidence known to

the Relators establishing the existence of Defendant's false claims. Because the disclosure

statement includes attorney-client communications and work product of Relators' attorneys, and

is submitted to the Attorney General and to the United States Attorney in their capacity as

potential co-counsel in the litigation, the Relators understand this disclosure to be confidential.

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

2009 JUL -1 PM 4:29

FILED

T 050481
$350.

## Jurisdiction and Venue

3. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 31 U.S.C. § 3732(a).

4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because some of the acts proscribed by 31 U.S.C. § 3729 and complained of herein took place at hospitals located in the Middle District of Florida, and is also proper pursuant to 28 U.S.C.S. § 1391(b) and (c) because at all relevant times Defendants transacted business in the Middle District of Florida, and nationwide.

## Parties

5. Relator Joseph Fuentes was Key Account Manager, and head of the Presidents Council for Defendant between September 2005- June 2009. Relator Christopher Russo was a Biosurgical Specialist for Defendant between March 2006 and November 2007.

6. Defendant Genzyme Corporation is a publicly traded biotechnology company based in Cambridge, Massachusetts. Its Genzyme Biosurgery division manufactures and markets Seprafilm, an adhesion barrier drug which prevents tissue adhesions after surgery. **Exhibit 1.**

## Medicare Program Requirements

7. Section 30 of Chapter 1 of the Medicare Benefit Policy Manual provides that hospitals will be reimbursed under the Medicare Part A program for drugs and biologicals only if "[u]se of the drug or biological [is] safe and effective and otherwise reasonable and necessary as specified in the Medicare Benefit Policy Manual, Chapter 15, 'Covered Medical and Other Health Services,' §50." Section 30 further states that "[d]rugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for

purposes of this last requirement when used for indications specified in the labeling." Finally, Section 30 provides that when FDA-approved drugs are used for indications other than those specified on the labeling and the FDA has not specified such use as nonapproved, coverage decisions are made by local medical review policy taking into consideration the generally accepted medical practice in the community.

8. Section 50.4.2 of Chapter 15 of the Medicare Benefit Policy Manual provides that "FDA approved drugs used for indications other than what is indicated on the official label may be covered under Medicare if the carrier determines the use to be medically accepted, taking into consideration the major drug compendia, authoritative medical literature and/or accepted standards of medical practice."

9. As of July 1, 2009, no local coverage determinations had been made by Medicare carriers that the Medicare Part A program would reimburse hospitals for the use of Seprafilm for indications other than what is indicated on the FDA approved label. Thus, use of Seprafilm for indications other than what is indicated on the FDA approved label are non-covered services under the Medicare Part A program and are therefore non-reimburseable under the Part A program.

10. Medicare Part A hospital cost report certifications require the signing officer or administrator to certify that "the services identified in this cost report were provided in compliance with" "the laws and regulations regarding the provision of health care services." Therefore, a Medicare Part A hospital cost report certification affirmatively represents that the costs included in the cost report for which the hospital is seeking reimbursement from the Medicare program are for covered services.

11. Thus, including costs for non-covered services, such as for Seprafilm used for off-label purposes, in a hospital cost report submitted for reimbursement under the Medicare Part A program (1) renders the accompanying cost certification false; and (2) constitutes a false and fraudulent claim under the False Claims Act.

## The Defendant's Scheme to Defraud Medicare

12. Genzyme engaged in a nationwide scheme to promote and sell the off-label use of Seprafilm known as "slurry" to doctors and healthcare providers throughout the medical community. These marketing schemes employed by Genzyme to promote and sell the off label use of Seprafilm known as "slurry",[1] consist of the promotion and marketing of Seprafilm for indications other than those approved by the FDA.

13. Genzyme made false statements, which it knew were to be false, and would result in false claims for off-label uses being submitted to Medicare or other federal and state payors.

14. These off-label promotion and marketing schemes of Genzyme caused Seprafilm to be used for and billed to Medicare for a multitude of off-label uses including but not limited to:

    a) Gynecological off-label uses: (1) Laparoscopic hysterectomy ("TAH"), (2) Laparoscopic bilateral/unilateral salpingo oopherectomy ("BSO"), (3) Laparoscopic removal of pelvic mass, (4) Laparoscopic pelvic and periaortic lymph node dissection ("PPLND"), (5) Laparoscopic omentecomy, (6) Laparoscopic lysis of adhesions, (7) Laparoscopic myomectomy, (8) Laparoscopic tubal ligation, and (9) Exploratory Laparoscopy;

---

[1] "Slurry" is made by breaking up Seprafilm, then putting it into a bowl and mixing it with an amount of saline determined by an individual sales representative until the product's consistency turns into a gel. Then that product gets put into a Toomie syringe. Because of the additional changes, such as the addition of saline mixed into the broken up Seprafilm, the consistency becomes different (i.e. it is no longer is a sheet, but rather a gel now), furthermore the chemical composition of the original Seprafilm becomes different too. Because the original product's chemistry, composition and overall consistency are changed, and now different, it is not Seprafilm (in its original approved form) but rather it's now an unknown off-label product. *See* **Exhibit 10.**

b) Robotic Gynecologic off-label uses (robotic surgery is a type of laparoscopy) such as: (10) Robotic hysterectomy, (11) Robotic Bilateral/unilateral salpingo oopherectomy, (12) Robotic removal of pelvic mass, (13) Robotic pelvic and periaortic lymph dissection, (14) Robotic omentecomy, (15) Robotic lysis of adhesions, (16) Robotic myomecomy, and (17) Robotic Diagnostic Laparoscopy

c) General/Colorectal Surgery off label uses such as: (18) Laparoscopic hernia repair, (19) Laparoscopic cholecystectomy, (20) Laparoscopic lower anterior resection, (21) Laparoscopic lysis of adhesions, (22) Laparoscopic, hand assisted liver resection, (23) Laparoscopic left/right hemi-colectomy, (24) Laparoscopic transverse colectomy, and (25) Laparoscopic sigmoid resection; and Urologic off-label uses such as: (26) Robotic prostatectomy.

15. As a result of Genzyme's off-label promotion and marketing schemes, Seprafilm was used for many unauthorized and unsafe indications, other than the FDA approved indications, as identified above.

16. As described in the preceding paragraphs, Genzyme caused hospitals nationwide to purchase Seprafilm for off-label and for non-reimbursable indications. These off-label uses in turn were electronically recorded on the hospital's UB Form. The information, claims, on the UB Form is then used to determine outlier payments, the cost to charge ratio, patient reimbursement based on the DRG assigned (Medicare Part A), patient reimbursement under Medicare Part B, which is paid based on individual charges, and in the cost reports. The inclusion of a non-reimbursable expense has wide-ranging implication in the Medicare and Medicaid reimbursement structure as described herein.

17. Genzyme promoted and marketed the use of Seprafilm for indications other than those FDA approved even though this is illegal.

18. Defendant continues to train and encourage, both overtly and covertly, its Seprafilm sales representatives to market "slurry" for off-label uses.

19. Knowing the FDA strictly prohibits off-label promotion, Genzyme still continues to train its sales representatives to promote and sell "slurry" (the off-label use of Seprafilm) to physicians, hospitals and other healthcare providers for both unapproved and unsafe uses.

20. Joe Brennan, Defendant's Vice President of Sales, in August 2007 overtly stated that at least 30% of Seprafilm sales revenue was off-label. Many employees complained about the pressure of selling "slurry" (off-label use of Seprafilm) to both Genzyme management and at the Presidents Council meetings. **Exhibit 2.**

21. From at least December 2002 to present, Genzyme routinely, and as a pattern and mode of practice, knowingly engaged in a nationwide scheme to market Seprafilm for off-label uses.

22. Genzyme trained its sales associates to sell the off-label uses of Seprafilm, known as "slurry" to hospitals, physicians and other healthcare providers in the medical community.

23. Genzyme's off-label uses of Seprafilm are being promoted for unapproved uses and are misleading physicians as to the approved uses while concealing adverse affects of such off-label use.

24. Even though "slurry" (the off-label use of Seprafilm) is unapproved and unsafe, Genzyme continues to promote the off-label use of Seprafilm, because "slurry" (the off-label product) generates a high volume of revenue for Genzyme.

25. Genzyme's practice is both knowing and willful. Genzyme actually trains its sales representatives to promote off-label use of Seprafilm to both doctors and members of the medical community.

26. Genzyme trains its new sales reps how to promote and sell "slurry" from the

27. very beginning of their employment during their field training.

28. Defendants also would train the new sales reps how to teach physicians how to make and use "slurry" in surgery.

29. Genzyme not only trains its sales reps to promote and sell the off-label use of Seprafilm, but even includes the sale of "slurry" in the sales quotas of its sales representatives. This not only shows complete disregard of the FDA and the law, but of the safety of patients.

30. These acts show that Genzyme not only knew of the marketing and promotion of the off-label product but also intended and expected to promote and sell the off-label product called "slurry" to physicians and other healthcare providers.

### Evidence

31. During Relator Chris Russo's field training, held on or about March 1-21, 2006, Mr. Russo was trained by three Genzyme reps to promote "slurry". During Mr. Russo's field training, Genzyme reps participated in role-playing whereby they taught Mr. Russo how to promote and sell "slurry", how to make "slurry" and how to teach physicians how to make "slurry" for procedures.

32. On Relator Russo's first day of work, his Field Trainer, Sean Wheat, gave instructions to Mr. Russo on how to make and promote "slurry". **Exhibit 3.**

33. Genzyme trained Mr. Russo how to overcome physician's objections to using "slurry"

34. Mr. Scott Pfafman, the top seller of "slurry" at Genzyme, was continuously rewarded for leading sales for 9 out of 10 years. Because Mr. Pfafman was Genzyme's top performer, Genzyme considered Mr. Pfafman as the "rainmaker" and Mr. Pfafman was continuously asked and paid to teach new sales reps how to promote the sale of "slurry".

35. Mr. Cooper said that every time he told upper management of Genzyme (i.e. Vice President of Sales Joe Brennan and Area Business Manager Jim Traa) about sales reps complaining about the pressure to sell "slurry", upper management ignored his pleas.

36. Mr. Cooper affirmed that the entire west region (lead by Mr. Devin Hughes, Genzyme's West Coast Regional Manager) is still selling massive amounts of "slurry."

37. After so many reps raised the issue of feeling uncomfortable about illegally promoting "slurry" and about Genzyme's push to promote "slurry" by including it in sales quotes.

38. On October 5, 2007, Relator Fuentes asked Southeast region sales representatives to promote the number of surgeons who use "slurry" in their territory so that it could be addressed in the President's Council Call. **Exhibit 4.**

39. Relator Russo, as did other reps in the Southeast region, outwardly admitted their sales of "slurry." **Exhibits 5, 6 & 7.**

40. Relator Fuentes wanted to address the amount of off-label promotion and sales of "slurry" on the President's Council Call to Genzyme's upper management so he could attempt to get Genzyme to discontinue forcing the illegal promotion and sales of "slurry" on sales reps and especially to discontinue including it in their sales reps quotas.

41. Genzyme continued to turn a blind eye to Relator Fuentes and the sales reps by continuing to include "slurry" in their reps' sales quotas.

42. On October 5, 2007, Mr. Pfafman sends an email about the President's Council, and outwardly requests all sales reps and members of the President's Council (Mr. George Makhoul, Mr. Franco Ciaravino, Mr. Thomas Tierney, Mr. Scott Pfafman, Mr. James Eastman, Mr. Daniel Ferris, Mr. Joseph Fuentes, and Ms. Heather Rodriguez) to provide him with the amount of "slurry" sales and the number of physicians per region using "slurry". **Exhibit 8.**

43. Relator Fuentes has attempted many times to have Genzyme's management correct this issue. Nothing ever changed, and Genzyme continues to recognize and encourage sales of "slurry" in its reps' quotas.

44. In **Exhibit 9,** Christine Williams states that she is faced with a hard decision to sell "slurry" or likely lose her job with Genzyme if she does not sell "slurry".

45. Genzyme not only promoted "slurry", but also, on May 27, 2009, during demonstration of the product, walked the operating scrub tech through how to make "slurry" in the operating room. **Exhibit 10.**

46. In Genzyme's corporate email on June 6, 2008, Genzyme's sales rep Danny Kunath also admits to selling "slurry". **Exhibit 11.**

47. Again, in another corporate email, on April 3 2009, Mr. Kunath tells Mr. Fuentes that he has an issue with the Genzyme saying not to sell "slurry" but yet Genzyme is not only well aware that such sales occur, but also rewards its reps for promoting and selling "slurry." **Exhibit 12.** For example, Mr. Pfafman sells high volumes of "slurry", and Genzyme rewards Mr. Pfafman for being its highest seller, through commissions (a $10,000 bonus) and an all expense paid vacation every year worth over five thousand dollars.

48. Through corporate email, Mr. Danny Kunath admits pushing "illegal product." **Exhibit 13.**

49. Mr. George Makhoul, Northeast Key Account Manager (KAM), spoke with Relator Russo on October 17, 2007 for over an hour when Relator Russo wanted to quit working for Genzyme because he did not want to sell any more "slurry." **Exhibit 14.**

50. Relator Russo told Mr. Makhoul that he had disagreed with both Genzyme's promoting and selling "slurry" and Genzyme's expectation of the promotion of "slurry" by incorporating it in the sales reps quota, because that demonstrated Genzyme's condoning of the promotion and sale of "slurry".

51. Mr. Pfafman sent Relator Russo a text message. Relator Russo called Mr. Pfafman back on October 23, 2009 and spoke for about 20 minutes. **Exhibit 15.** Mr. Pfafman heard that Relator Russo was quitting because Relator did not want to continue to participate in Genzyme's push to have its reps promote the sale of "slurry".

52. Although Mr. Pfafman was Genzyme's sales rep of the year for 9 out of 10 years, Mr. Pfafman too admitted that Genzyme's off-label promotion would be impossible to stop because Genzyme incorporated sale of "slurry" in its sales quotas.

53. On or about October 31, 2007, Relator Russo had his exit interview with Mr. Joe Brennan, Genzyme's Vice President of Sales, and Human Resources Manager. During this exit interview, Relator Russo discussed the issue of Genzyme not only forcing sales reps to promote "slurry" but actually including "slurry" in their sales quotas.

54. Mr. Brennan, Vice President of Sales, replied "I don't think it is that big of a problem!" and thereby ignored Relator Russo's complaints about Genzyme continuing to force Genzyme's sales reps to promote and sell "slurry" and fixing it into their reps' sales quotas.

55. On June 11, 2009, Relator Fuentes decided to also quit working for Genzyme because of the pressure to promote and sell "slurry."

56. In Relator Fuentes' exit interview, he complained to Human Resource Manager Cara Indirsano about his quitting being based on Genzyme's pressure to continue selling "slurry" and how it was wrong of Genzyme to incorporate "slurry" into the quotas of their sales force. After being told this by Relator Fuentes, Cara Indirsano abruptly terminated the conversation and his exit interview.

## Defendant's Field Training

57. In addition to forcing reps to illegally promote and sell "slurry" by putting into their sales rep quotas, Genzyme also had management train new hires to promote and sell "slurry," proof that Defendant not only engaged in promoting "slurry" but that Genzyme also intended to continue promoting the off-label use and sale of "slurry."

58. Mr. Shawn Sibon described his training to Genzyme's upper management, namely Mr. David Corin, Head of Genyzne's Training Department, and Mr. Devin Hughes, West Coast Regional Manager. **Exhibit 16.** On day 3, Mr. Sibon states that during his field training he was taught how to promote the off-label use of Seprafilm (since it was used laproscopically) in robotic procedures.

59. Because Mr. Sibon's email was sent to Genzyme management, Genzyme was obviously aware, that Mr. Sibon was being trained to promote off-label use of Seprafilm, but yet Genzyme did nothing to stop or punish this illegal behavior.

60. Ms. Jennie Trefilek described her training in a corporate email. **Exhibit 17.** Ms. Trefilek said her key learning experience from Genzyme's field training was "how to make and use "slurry", and documents all the cases she supervised (such as in a laparoscopic assisted vaginal hysterectomy) in which "slurry" was used.

61. Ms. Trefilek's email on her training experience was sent to Genzyme's upper management, including Mr. Corin and Mr. O'Donnell. Even after these managers were notified by email that Ms. Trefilek was being trained to promote "slurry", Genzyme did nothing to prohibit this training from recurring or to punish this behavior.

62. Mr. Troy Boutelle described his field training through a corporate email that was sent to Genzyme's upper management and executives such as Mr. David Corin, Mr. John O'Donnell and Mr. Joseph Fuentes. **Exhibit 18.** In fact, Mr. Boutelle's email discusses his field training of promoting off-label use of Seprafilm on a laparoscopic colon resection, which is widely known by Genzyme as being an unsafe and unapproved procedure for the use of Seprafilm.

63. Genzyme has done studies showing that the off-label use of Seprafilm should NEVER be used in a laparoscopic colon resection, because when Seprafilm is wrapped around a colon for reconnection it causes leaks, and yet, Genzymes concealed this information from the doctor they promoted Seprafilm to.

64. Seprafilm should not have been used or promoted for this type of surgery, especially since Genzyme knew the adverse affects existed from their own findings! This is another example of Genzyme not only promoting off-label use of Seprafilm "slurry", but also concealing its adverse affects on patients.

65. Mr. Taylor Blalock also described his training experience through corporate email, and said he too was being trained by Genzyme to promote off-label Seprafilm with a Divinci Robot. **Exhibit 19.**

66. Mr. Jeff Palmer sent a text to Relator Russo stating he was going to work a robotic case, through his promotion of "slurry". **Exhibit 20.**

67. The Key Account Manager (KAM) reports affect everyone working for Genzyme. Those monthly reports discuss Seprafilm, and the promotion and sales of "slurry" due to Genzyme's sales reps.

68. These reports by Genzyme's managers are proof of Genzyme sending a clear message that since the Key Account Managers are working hard to promote "slurry" and Genzyme is including the sale of "slurry" in the sales reps quotas then that is what Genzyme sales reps need to do to be part of the team and to be successful at Genzyme. **Exhibit 9.**

69. On May 9th, 2009, Dr. Imagawa, a surgical oncologist from California, was hired by Genzyme to do a paid lecture in Cleveland, Ohio on adhesions and surgery. During that lecture, Dr. Imagawa promoted using "slurry", the off-label use of Seprafilm, to an audience of physicians, nurses and other medical providers.

70. At the recent ACOG meeting in Chicago, two Genzyme reps, Ms. Jenny Trefilek of Detroit and Ms. Colleen Russell of Chicago, were approached by two doctors from Hawaii. These physicians were celebrating how Defendant's rep, Ms. Erin Smith, taught these doctors how to use Seprafilm as an off-label use and showed them how easily they can turn Seprafilm into "slurry".

71. Ms. Trefilek and Ms. Russell rightfully reported this information to Mr. Joe Brennan, the Genzyme Vice President of Sales. The rep manager of Ms. Trefilek and Ms. Russell, Mr. John O'Donnell, followed up with Mr. Joe Brennan to see if Erin Smith could be reprimanded for promoting off-label use of Seprafilm. Mr. Brennan simply denied the information (about the off-label promotion) and then said he never heard a complaint made. Mr. John O'Donnell was very upset.

72. Mr. Joe Brennan then sent Mr. John O'Donnell an email reprimanding his reporting of the Erin Smith's illegal off-label promotion. Furthermore, Mr. Brennan questioned if Mr. O'Donnell was happy with his role with Genzyme, implying he would lose his job if he attempted to report any off-label promotion by Genzyme again.

### Adverse Affects on Patients

73. Ms. Amy Weber, a former sales rep at Genzyme, was pressured to promote and sell "slurry" to physicians in her territory. Ms. Weber was directed and pushed to promote and sell "slurry" to Dr. Holloway in Orlando because his business would make Genzyme wealthier.

74. Genzyme had sent Ms. Weber to ride with and get trained by Genzyme's top seller, Mr. Pfafman, in an effort to learn how to sell "slurry" like an expert, in hopes that this could capture Dr. Holloway's business.

75. Although reps normally didn't have two trainings, Genzyme made Ms. Weber go through another training to "better" promote "slurry" to increase her sales. This training took place approximately 15 months after Ms. Weber's initial training and field rides.

76. Making Ms. Weber go through another field training to push "slurry" better is yet another example that Genzyme not only condoned this behavior, but also encouraged it.

77. Mr. Cooper told Relator Russo that eventually Ms. Weber was pushed to circumvent Dr. Holloway and to convince Dr. Holloway's fellow, Sarah Denartis, to promote using "slurry" to Dr. Holloway.

78. Genzyme encouraged Ms. Weber to say that there were "patient benefits" in using "slurry". Dr. Holloway eventually agreed to use "slurry" on his patients.

79. After using "slurry," and finding several adverse events with its use, Dr. Holloway called Matt Trudeau, Director of Marketing at Genzyme and explained to Mr. Trudeau that there

were adverse events with this composition of the product and told Genzyme to stop promoting "slurry", especially to him.

80. Mr. Cooper doesn't think those adverse events were ever documented with Genzyme's Medical Affairs Department, yet *ALL* adverse events are required to be.

81. Ms. Weber resigned very soon after Dr. Holloway had adverse affects with his patients.

82. Although Genzyme is aware of the adverse affects of "slurry," none of the adverse affects were conveyed to any of the physicians to whom Genzyme was promoting off-label usage. **Exhibit 19.**

83. In spite of the fact that Genzyme knew about the adverse affects, Genzyme promoted "slurry" as safe and having "benefits" to off-label usage.

84. Genzyme not only concealed the fact that adverse affects exist with use of the off-label use of Seprafilm "slurry", Genzyme also misrepresented the facts and promoted the off-label use of Seprafilm "slurry" as having patient "benefits" too.

85. Defendant's sales rep, Mr. Taylor Blalock, outwardly confirms the adverse affect in a text stating "Gynocs possibly not using slurry because of absess." **Exhibit 21.**

86. Mr. Blalock's admission of abscesses because of the use "slurry" (via his text) is an example of Genzyme being aware of the adverse affects caused by the off-label use of Seprafilm, patients suffering those adverse affects but Genzyme wrongfully concealed this information from both physicians and patients.

87. Because Genzyme promoted off-label uses and concealed potential adverse affects, this caused patients to suffer from adverse affects such, as but not limited to, abscesses and leakages.

88. These adverse affects in turn caused more tests and exams to have to be made, and prolonged patient stays in the hospitals.

89. The leaks and adverse affects caused by the off-label use of Seprafilm has caused patients to have to be readmitted and possibly have to go through another surgical procedure to fix the leaks caused by the off-label use of Seprafilm.

### Payments of Kickbacks to Physicians
### to Induce Use of Seprafilm and "Slurry"

90. Genzyme also encouraged, overtly or covertly, its Seprafilm sales representatives to provide items of value to physicians and others in order to induce sales of both Seprafilm and "slurry". These items of value included grants and other items of value for physicians, nurses and others who were in a position to influence the purchase of Seprafilm.

91. These acts violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b and in turn generated false claims under the False Claims Act.[2]

92. Defendant paid excessive fees to speakers to encourage their continued use and promotion of Seprafilm for unapproved indications.

93. Genzyme pays hundreds of physicians with checks in thousand dollar increments and pays for expensive lavish dinner parties at fine establishments simply to promote and induce the use and sales of Seprafilm and "slurry".

94. Genzyme invites doctors to get paid to be a "speaker" to promote its product yet no content has to be reviewed.

95. Genzyme representatives conduct this type of solicitation all over the nation.

96. Genzyme pays these high volume doctors and disguises such payments as "honorariums" in order to induce these doctors to get hospitals to purchase Defendant's products.

---

[2] *McNutt v. Haleyville Medical Supplies, Inc.,* 423 F.3d 1256, 1259 (11th Cir. 2005).

97. Genzyme induces these doctors to promote Defendant's products to other doctors in the medical community.

98. This kickback strategy is paid for through the Defendant's "medical education department" instead of from the Defendant's sales reps' budget so that Genzyme can circumvent CMS guidelines.

99. Genzyme pays hundreds of thousands of dollars to physicians to be paid "speakers" at "speaking events" that basically take place over dinner and drinks at restaurants of the physicians' choice, usually being fine restaurant establishments. **Exhibit 22.**

100. These disguised "speakers" never had to follow any protocol or instructions as "speakers." Instead, Genzyme simply induced these physicians by paying them to encourage the sale of both Seprafilm and "slurry" and to invite other physicians to promote and induce the use of Seprafilm and "slurry" by other physicians.

101. This kickback strategy worked, thereby increasing the sales of Seprafilm and "slurry" in the medical community.

102. Genzyme would give checks to physicians as a kickback for promoting both Seprafilm and "slurry" to use, and for basically encouraging their peers and other members of the medical community to purchase Seprafilm product.

103. These so called "educational" dinners are disguises for Genzyme's kickbacks (through checks and fancy expensive meals) to induce physicians to promote the purchase of Seprafilm and "slurry".

104. Normally Medicare sets limits on dinners per physician to prevent kickbacks like this from occurring; however, Defendant has attempted to circumvent these limits by arguing

that the limits do not apply because Medicare does not reimburse for Seprafilm or "slurry" directly.

105.  Genzyme's total cost of the speaker dinners over the last year is in excess of hundreds of thousands of dollars to promote and induce Defendant's off-label "slurry" business.

106.  Many of these bogus "medical education" dinners were conducted without any "medical education," yet Defendant still would pay for these expensive dinners. **Exhibit 23.**

107.  Genzyme sales rep Mr. Taylor Blalock called Relator Fuentes on June 13, 2009 and told him about a speaker's bureau dinner Mr. Blalock hosted at the Capitol Grille in Jacksonville. Mr. Blalock told Relator Fuentes that the physician did not review any material at the dinner at the Capitol Grille, but Genzyme still paid for the dinners and gave a check for $1,000.00 to the physician.

### Count I: Causing to Be Presented False and
### Fraudulent Claims in Violation of 31 U.S.C. § 3729(a)(1)(A)

108.  Relators reallege and incorporate by reference paragraphs 1 through 107.

109.  From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent Medicare claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

## Count II: Making False Statements to Get False and
## Fraudulent Claims Paid in Violation of 31 U.S.C. § 3729(a)(2)

110. Relators reallege and incorporate by reference paragraphs 1 through 107.

111. From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States by falsely telling physicians that the off-label use of "slurry" was safe and medically effective.

112. By virtue of the false and fraudulent claims made by Defendant, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count III: Conspiracy to Defraud
## in Violation of 31 U.S.C. § 3729(a)(3)

113. Relators reallege and incorporate by reference paragraphs 1 through 107.

114. From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the United States

115. By virtue of the false and fraudulent claims made by Defendant, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relator respectfully request this Court enter judgment against Defendant and order:

    a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§3729 *et seq.* provides;

b) That civil penalties of $11,000 be imposed for each and every false and fraudulent claim that Defendant presented to the United States;

c) That pre and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

e) That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

f) That this Court award such other and further relief as it deems proper.

## Demand for Jury Trial

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

Respectfully submitted,

BARRY A. COHEN, ESQ.
Florida Bar No. 096478
KEVIN J. DARKEN, ESQ.
Florida Bar No. 0090956
NATALIE K. KHAWAM, ESQ.
Florida Bar No. 0027997
Cohen, Foster & Romine, P.A.
201 E. Kennedy Boulevard, Suite 1000
Tampa, FL 33602
Telephone:     (813) 225-1655
Facsimile:     (813) 225-1921
Attorneys for Relators

## CERTIFICATE OF SERVICE

I HEREBY CERIFY that the foregoing False Claims Act Complaint and Demand for Jury Trial has been furnished by *Hand-Delivery* to: **A. Brian Albritton, United States Attorney,** United States Attorney's Office, 400 N. Tampa Street, Suite 3200, Tampa, Florida 33602; and by *Certified Mail, Return Receipt Requested* to: **Civil Process Clerk,** 400 N. Tampa Street, Suite 3200, Tampa, Florida 33602; and **Eric Holder, United States Attorney General,** Department Of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-001 on this 1st day of July 2009.

Barry A. Cohen
bcohen@tampalawfirm.com
Florida Bar No. 096478
Kevin J. Darken
kdarken@tampalawfirm.com
Florida Bar No. 0090956
Natalie K. Khawam
nkhawam@tampalawfirm.com
Florida Bar No. 0027997
COHEN, FOSTER & ROMINE, P.A.
201 East Kennedy Boulevard, Suite 1000
Tampa, Florida 33602
Telephone:     (813) 225-1655
Facsimile:     (813) 225-1921
Attorneys for Relators